

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 2-08-235-CR**
**NO. 2-08-236-CR**
**NO. 2-08-237-CR**


JAMES KEVIN POPE                                                    APPELLANT

V.

THE STATE OF TEXAS                                                        STATE

------------

FROM THE 415TH DISTRICT COURT OF PARKER COUNTY

------------

## MEMORANDUM OPINION[1]

------------

The complainants in these cases are Appellant James Kevin Pope's three teenaged daughters—twins K.L.P. and K.M.P. and youngest daughter K.O.P.; each indictment contains counts alleging conduct perpetrated against a specific daughter. In all, a jury convicted Appellant of forty counts of sexual assault of

------------

[1] ⬆ *See* Tex. R. App. P. 47.4.

a child and three counts of sexual performance by a child. The jury assessed

his punishment at life imprisonment and a $10,000 fine for each count of

sexual assault of a child. For each count of sexual performance by a child, the

jury assessed his punishment at twenty years' confinement and a $10,000 fine.

The trial court sentenced Appellant accordingly and ordered that the sentences

be served consecutively. Appellant complains about the factual sufficiency of

the evidence and the absence of a jury instruction. Because we hold that the

evidence is factually sufficient and that the trial court's error in omitting the jury

instruction was harmless, we affirm the trial court's judgments.

## I. Factual Sufficiency of the Evidence

In his third, fourth, fifth, sixth, seventh, and eighth points, Appellant

contends that the evidence is factually insufficient to sustain the jury verdicts,

relying on the conflicts in his daughters' testimony.

### A. Standard of Review

When reviewing the factual sufficiency of the evidence to support a

conviction, we view all the evidence in a neutral light, favoring neither party.[2]

We then ask whether the evidence supporting the conviction, although legally

---

[2] *Neal v. State,* 256 S.W.3d 264, 275 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 1037 (2009); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006).

2

sufficient, is nevertheless so weak that the factfinder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the factfinder's determination is manifestly unjust.[3] To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict.[4]

In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court "harbor a subjective level of reasonable doubt to overturn [the] conviction."[5] A jury may choose to believe some witnesses but not others; it may also believe some portions of a witness's testimony but reject other portions of the same witness's testimony.[6] We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury's

---

[3] *Lancon v. State*, 253 S.W.3d 699, 704 (Tex. Crim. App. 2008); *Watson*, 204 S.W.3d at 414–15, 417.

[4] *Watson*, 204 S.W.3d at 417.

[5] *Id*.

[6] *Losada v. State,* 721 S.W.2d 305, 309 (Tex. Crim. App. 1986).

resolution of a conflict in the evidence.[7]  We may not simply substitute our

judgment for the factfinder's.[8]  Unless the record clearly reveals that a different

result is appropriate, we must defer to the jury's determination of the weight

to be given contradictory testimonial evidence because resolution of the conflict

"often turns on an evaluation of credibility and demeanor, and those jurors were

in attendance when the testimony was delivered."[9]  Thus, unless we conclude

that it is necessary to correct manifest injustice, we must give due deference

to the factfinder's determinations, "particularly those determinations concerning

the weight and credibility of the evidence."[10]  Our deference in this regard

safeguards the defendant's right to a trial by jury.[11]

### B.  Background Facts

K.L.P. and K.M.P. were born on January 16, 1990; K.O.P. was born on

November 29, 1991.  The family lived in Springtown, Parker County, Texas for

several years before moving to Iowa.  Shelly, the girls' mother and Appellant's

---

[7] *Watson*, 204 S.W.3d at 417.

[8] *Johnson v. State*, 23 S.W.3d 1, 12 (Tex. Crim. App. 2000); *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).

[9] *Johnson*, 23 S.W.3d at 8.

[10] *Id*. at 9.

[11] *Lancon*, 253 S.W.3d at 704.

wife, testified that in the spring of 2005, while the family was still in Iowa, she became concerned after a conversation with K.M.P. that Appellant was taking nude photographs of the girls. When Shelly asked Appellant for the family digital camera and explained that she wanted to determine whether there were any such images of the girls on it, Appellant told her that "he only did that to see if they would do as he told." In February 2006, Shelly went to jail and eventually prison for mail fraud. Appellant and their daughters moved back to Springtown in March 2006. Shelly moved to a halfway house in Fort Worth in May 2007 and joined the family in Springtown on or about June 19, 2007.

According to K.O.P.'s testimony, at the end of November or early in December 2007, she got in trouble for skipping school. Appellant told her to consider having sex with him. She told him, "No," and in mid-December 2007, told her mother about that incident as well as past incidents.

Shelly testified that in approximately December 2007, she and K.O.P. had a conversation about Appellant acting inappropriately with the girls. Shelly then spoke to K.L.P. and K.M.P. After speaking with the girls, Shelly took them to the home of their maternal grandfather. When she returned home that same evening, she told Appellant that she "knew he had had sex with" K.L.P. and "that he had made the other two [K.M.P. and K.O.P.] give him blow jobs," that is, "oral sex." Shelly testified that when she told him that she knew about the

5

sexual intercourse with K.L.P., Appellant "kind of put his head down and said he didn't know why he had done it and that he was sorry." Shelly stated that when she confronted him with the fact that he had had oral sex with their other two daughters, Appellant "said that he would promise never to be around the girls alone again . . . and that he was sorry." He also promised "[t]hat he would get counseling and wouldn't touch them again and would act like a normal father." He did not deny Shelly's accusations or say that the girls had lied. The next day, Shelly brought the girls back home, and Appellant apologized and said that "it wouldn't happen again." Shelly did not notify the police or CPS.

Walter Smith, Appellant's friend, testified that on February 10, 2008, Appellant told him that the girls were going to accuse Appellant "of doing something with them to save their mother from going back to prison." Appellant also discussed the fact that Shelly shaved her pubic area and he liked it. Appellant told Walter that he would go into the bathroom when the girls were showering and that "he would notice that they also had a shaved area as well."

Appellant had told Walter on a prior occasion that when the family was living in Iowa, he and the girls had played a "titty twisting" game. A friend spending the night with the girls had told her mother, who had reported the incident to Iowa's agency charged with the protection of children. The agency

6

investigated the allegation but did not remove the girls from the home. Walter shared his concerns with his girlfriend, Laurie Parker, Shelly's coworker. Laurie told Shelly, who then spoke with Walter.

After her conversation with Walter, Shelly went home and packed Appellant's bags. When he got home and asked what was going on, she told him that "he was stupid . . . [a]nd he had gotten mouthy and that [she] wasn't going to have him bragging about something he had done." She still did not notify the police or CPS, but Walter and Laurie did.

On February 15, 2008, after CPS had been notified but before Appellant's arrest, a sheriff's investigator, Robert Pawley, and a CPS investigator interviewed the girls at their school. The police then searched the home with Shelly's consent and seized a digital camera and two desktop computer towers. With Shelly's permission, the police searched the SD card in the digital camera the following week. The police also conducted more extensive interviews with Shelly and the girls. Pawley testified that seeing the digital pictures confirmed his belief that the girls had been sexually abused and confirmed the girls' reports. An arrest warrant was then issued, and Appellant was arrested in Amarillo in late February 2008. Appellant told the CPS investigators that the girls were liars.

Appellant's jailhouse conversations with his mother were recorded, and two were admitted into evidence. In a telephone call he made from jail to his mother, Appellant stated, "[T]hey were never forced. . . . I treated them like adults. We sat down, we discussed it, we talked about it, and the decision was made." In a later telephone call with his mother, after she had testified under subpoena before the grand jury, he stated that he had incriminated himself in the earlier telephone call and in jailhouse visits. His mother stated in the telephone conversation that the choices he had made were bad but that he was not bad.

Appellant's daughters testified to hundreds of sexual offenses committed by Appellant over a period of more than two years, most happening in Parker County between May 2006 and November 2007.

At some point at the dinner table, Appellant and the girls had a conversation in which the girls discovered that they had all three been participating in sexual acts with him, and they reached an agreement where the sisters would take turns servicing him, with each sister performing once a week. Later, at another meeting, it was decided that he would be serviced every night by the girls, one per night.

The girls' testimony, which was at times externally and internally conflicting, is presented in more detail below.

8

Parnell Edward Ryan, a psychologist, licensed professional counselor, and licensed sex offender treatment provider, testified that he evaluated the three complainants in June 2008 at the request of CPS. He testified that K.L.P. exhibited anxiety and depression, which he classified as symptoms of sexual abuse. He stated that she also described what had occurred "in a manner of someone who has been in an incestuous family." He opined that K.L.P. was somewhere in between repression and recovery, but "leaning towards recovery." He stated that K.M.P.'s description of what had occurred was consistent, which he indicated was a characteristic of victims of sexual abuse. He also opined that her reaction was more of repression than recovery. He stated that K.O.P. fell somewhere between K.L.P. and K.M.P. in terms of symptomology; that is, she fell between her sisters on the continuum from repression to recovery.

State's Exhibits 8, 8A, 8B, and 8C, a 2006 calendar and color-coded overlays summarizing the testimony of each complainant, and State's Exhibits 9, 9A, 9B, and 9C, a 2007 calendar and color-coded overlays summarizing the testimony of each complainant, were admitted into evidence.

9

### C.  The Daughters' Testimony

#### 1.  Sexual Performance by a Child Counts[12]

Each indictment contains one count of sexual performance.  The counts allege that Appellant "did then and there intentionally or knowingly induce" the girls "to pose for photographs . . . which contain the lewd exhibition of the genitals and any portion of the female breast below the top of the areola."  The counts alleged that K.L.P. and K.M.P. took the photographs of each other and that K.O.P. took the photographs of herself.  The prosecutor elected to rely on conduct alleged to have occurred on or about May 18, 2006 for the sexual performance counts regarding K.L.P. and K.M.P. and on conduct alleged to have occurred on or about August 2, 2006 for the sexual performance count regarding K.O.P.

K.L.P. testified that in April 2006, when she and K.M.P. were sixteen years old, Appellant asked her and her sister to take nude pictures of each other, playing with themselves.  K.M.P.'s testimony confirmed K.L.P.'s.  K.L.P. identified State's Exhibits 10 and 11, which were admitted into evidence, as pictures of herself and her twin, respectively.  K.M.P.'s testimony tracked K.L.P.'s.  Both photographs exhibit breasts and genitals, and both pictures are

---

[12] *See* Tex. Penal Code Ann. § 43.25 (Vernon Supp. 2009).

stamped "05/18/2006."

K.O.P. testified that in early August 2006, Appellant asked her to take some "naughty" pictures of herself. State's Exhibit 12 is a photograph of K.O.P., showing her breasts and genitalia. K.O.P. testified that she took the photograph in 2007 but that it is the same type of photograph that she originally took in August 2006. On cross-examination, K.O.P. testified that nude pictures of her were taken on three separate occasions, all in Texas. The first two episodes occurred when she was fifteen; the last one occurred when she was sixteen. K.O.P. took the photographs in the first and third episodes; K.L.P. took the photographs in the second episode. The photograph in Exhibit 12 was taken in the third episode by K.O.P. K.O.P. testified that the pictures from the first two episodes were still in existence. On redirect, K.O.P. testified that she took the pictures because Appellant requested it and that she did not really feel like she had a choice at the time; she stated, "Like, I was scared if I didn't do it." She also testified that Appellant had downloaded the photographs to the family computer.

Based on the applicable standard of review, we hold that the evidence is factually sufficient to support Appellant's convictions for the three sexual performance counts.

11

### 2. Counts Alleging Digital Penetration and Penetration of Complainants' Mouths with Appellant's Sexual Organ[13]

Each indictment contains four counts alleging the penetration of the complainant's mouth with Appellant's sexual organ. The indictments concerning conduct perpetrated against K.L.P. and K.M.P. each contain four counts alleging digital penetration by Appellant; the indictment concerning conduct perpetrated against K.O.P. contains two counts alleging digital penetration by Appellant.

### a. K.L.P.

The indictment alleging conduct perpetrated against K.L.P. contains four counts alleging the penetration of her mouth by Appellant's sexual organ and four counts alleging the penetration of her sexual organ by his finger. For the oral sex counts in which K.L.P. was the complainant and Appellant was alleged to have penetrated her mouth with his sexual organ, Counts I, III, VII, and XI, the prosecutor elected to rely on conduct alleged to have occurred on or about June 12, 2006, July 3, 2006, August 1, 2006, and November 27, 2006, respectively. For the digital counts in which K.L.P. was the complainant, Counts II, IV, VIII, and XII, the prosecutor elected to rely on conduct alleged to have occurred on or about June 12, 2006, July 3, 2006, August 1, 2006, and

---

[13] *See id.* § 22.011(a)(2)(A)(B), (f).

November 6, 2006, respectively.

K.L.P. testified that she performed oral sex on Appellant in the second week of June 2006. She also testified that during the same incident, he penetrated her "lady parts" with his finger. On cross-examination, she confirmed that by "lady parts," she meant the female reproductive sexual organs. She also testified that this same conduct, both the oral sex and the digital penetration, happened weekly from June 2006 through December 2006. Later, she clarified her testimony to say that from the end of August 2006, some weeks they had anal sex instead of oral sex; they would "switch off."

The 2006 calendar and K.L.P.'s corresponding overlay support the dates elected by the State for all of the relevant counts except Count XI. For that count, the prosecutor told the jury during closing argument that the State would rely on conduct that was alleged to have occurred on November 27, 2006 because K.L.P. had testified that she performed oral sex on Appellant during the four-way (with Appellant and the three complainants) that she described as occurring on or about that day. K.L.P. did testify that the four-way occurred after Thanksgiving but before December. But she did not testify that she performed oral sex on Appellant during that episode, nor did she testify that she did not. She did testify that they all agreed never to engage in a four-way again.

13

K.O.P. testified that two four-ways happened, one in early November and one in mid-November, and that all the girls performed oral sex on Appellant during each episode. K.M.P. testified that she remembered at least two four-ways— one after her seventeenth birthday (and therefore not indicted) and one that she testified at one point happened before and at another point after her seventeenth birthday. Her description of the four-ways did not include any mention of K.L.P. providing oral sex to Appellant. Nevertheless, the jury could have relied on K.L.P.'s testimony about the timing of the four-way along with K.O.P.'s testimony that K.L.P. performed oral sex on Appellant during the four-way to properly convict him on that count.[14]

Based on the applicable standard of review, we hold that the evidence is factually sufficient to support the verdicts on the four counts alleging the penetration of K.L.P.'s mouth by Appellant's sexual organ and the four counts alleging the penetration of her sexual organ by his finger.

### b. K.M.P.

The indictment alleging conduct perpetrated against K.M.P. contains four counts alleging the penetration of her mouth by Appellant's sexual organ and four counts alleging the penetration of her sexual organ by his finger. For the

---

[14] *See Losada*, 721 S.W.2d at 309.

oral sex counts in which K.M.P. was the complainant and Appellant was alleged to have penetrated her mouth with his sexual organ, Counts I, III, VII, and XI, as well as the digital counts in which K.M.P. was the complainant, Counts II, IV, VIII, and XII, the prosecutor elected to rely on conduct alleged to have occurred on or about August 14, 2006, December 4, 2006, August 21, 2006, and November 27, 2006, the four-way, respectively.

K.M.P. testified that she freaked out when her father first requested oral sex in June 2006 and that she refused. She said that at some point that night, K.L.P. went into his room. When K.L.P. came out of the room, she indicated that Appellant wanted K.M.P. to go into his room. K.M.P. maintained her refusal. K.M.P. testified that Appellant "left [her] alone for a little while." Three weeks to a month later, he asked her repeatedly to perform oral sex on him; she still refused. At some point she told him that she would give him a "hand job," that is, she agreed to use her hand on his penis to stimulate him. K.M.P. testified that the first occurrence of this sex act was probably in the last part of June 2006. During the same occurrence, Appellant digitally penetrated her "private area" or sexual organ with his finger. Appellant's ejaculate landed on K.M.P.'s stomach. K.M.P. testified that she performed a "hand job" on Appellant and that he digitally penetrated her sexual organ again the next week.

15

K.M.P. testified that from the time of the July 2006 meeting of Appellant and the girls where the schedule was set to allow each girl to "perform" once a week, Appellant would digitally penetrate her, and she would give him a hand job weekly until approximately the middle of August, when he said that he was tired of doing the same thing and asked her to switch to performing oral sex. She refused, but he cajoled her, stating, "[J]ust try it and see what happens. If you don't like it, we'll go back [to hand jobs]." K.M.P. then performed oral sex on Appellant as he digitally penetrated her sexual organ. He ejaculated in her mouth. From that point until approximately mid-September 2006, K.M.P. continued to perform oral sex on Appellant weekly, and in the same sessions, he would digitally penetrate her sexual organ. In mid-September 2006, K.M.P. testified, they "changed the schedule," with the girls performing sexual acts with their father in rotation, one girl per day, seven days a week.

K.M.P. remembered two "three-ways" with Appellant and K.L.P., one in December but before Christmas and one after the twins' seventeenth birthday (and therefore not part of the indicted conduct). She answered, "Yes," to the prosecutor's question whether the first week of December 2006 would be an approximate date of the first occurrence. K.M.P. testified that during the first occurrence, she performed oral sex on Appellant, and he digitally penetrated her sexual organ.

16

K.L.P. testified that the three-way with Appellant, K.M.P., and herself occurred one night in late September or early October 2006. K.L.P. testified that both girls performed oral sex on Appellant during this encounter.

K.M.P. testified that she remembered at least two four-ways. She believed that the first one occurred before her seventeenth birthday but also testified that it occurred after her seventeenth birthday. She had "never thought it was really possible" and stated that they "kind of had a hard time trying to figure out what to do." She testified that during the occurrence, she performed oral sex on Appellant, and he penetrated her sexual organ with his finger.

K.L.P. testified that at the four-way, which she also testified happened in late November 2006, Appellant performed oral sex on K.M.P. and digitally penetrated K.M.P.'s sexual organ. K.L.P. did not testify that K.M.P. performed oral sex on Appellant.

K.O.P. testified that two four-ways happened, one in early November and one in mid-November, that all the girls performed oral sex on Appellant during each episode, and that no digital penetration occurred during those events.

The 2006 calendar and K.M.P.'s corresponding overlay support the State's elections for Counts I, II, III, IV, VII, and VIII of the indictment in which she is the complainant. K.L.P.'s 2006 overlay supports the State's elections

17

for Counts XI and XII; K.O.P. and K.M.P.'s testimony supports the conclusions that K.M.P. performed oral sex on Appellant and that he digitally penetrated her sexual organ during the four-way.

Based on the applicable standard of review, we hold that the evidence is factually sufficient to support the verdicts on the four counts alleging the penetration of K.M.P.'s mouth by Appellant's sexual organ and the four counts alleging the penetration of her sexual organ by his finger.

### c. K.O.P.

The indictment alleging conduct perpetrated against K.O.P. contains four counts alleging the penetration of her mouth by Appellant's sexual organ and two counts alleging the penetration of her sexual organ by his finger. For the oral sex counts in which K.O.P. was the complainant and Appellant was alleged to have penetrated her mouth with his sexual organ, Counts I, III, VIII, and X, the prosecutor elected to rely on conduct alleged to have occurred on or about May 15, 2006, November 6, 2006, September 3, 2007, and November 19, 2007, respectively. For the digital counts in which K.O.P. was the complainant, Counts II and IV, the prosecutor elected to rely on conduct alleged to have occurred on or about May 15, 2006 and July 3, 2006, respectively.

K.O.P. testified that the first sexual act that occurred with Appellant and her after they moved back to Texas occurred toward the middle to the end of

18

May 2006. Appellant asked her to perform oral sex on him, and she did, and at the same time, he digitally penetrated her sexual organ. She also testified that this type of occurrence happened once or twice that week as well as the next and that these occurrences continued at that frequency through the middle of July 2006.

K.O.P. also testified that during the first of the two four-ways she remembered, which she said occurred in early November 2006, all three girls performed oral sex on Appellant. K.L.P. also testified that K.O.P. performed oral sex on Appellant during the four-way, which K.L.P. stated happened at the end of November.

K.O.P. also testified that after the second four-way, which she placed in early to mid-November 2006, until her Mother came home in June 2007, she and Appellant performed simultaneous oral sex on each other once or twice each week. By August 2007, K.O.P. testified, she and Appellant were again performing oral sex on each other once or twice a week, and this behavior continued through the end of November 2007.

The 2006 and 2007 calendars, along with K.O.P.'s overlays, support the dates elected by the State.

Based on the applicable standard of review, we hold that the evidence is factually sufficient to support Appellant's convictions for the four counts

19

alleging that he penetrated K.O.P.'s mouth with his sexual organ and the two counts alleging that he penetrated her sexual organ with his finger.

### 3. Counts Alleging Contact of Complainants' Sexual Organs with Appellant's Mouth or the Mouths of Their Sisters[15]

Each indictment contains three counts alleging contact with the complainant's sexual organ by Appellant's mouth. The indictments concerning conduct perpetrated against K.L.P. and K.M.P. each contain three counts alleging that Appellant caused contact with the sexual organ of the complainant by the mouth of one of the other daughters. The indictment concerning conduct perpetrated against K.O.P. contains two such counts.

### a. K.L.P.

The indictment alleging conduct perpetrated against K.L.P. contains three counts, Counts V, IX, and XIII, alleging that Appellant caused her sexual organ to contact his mouth. For these counts, the prosecutor elected to rely on conduct alleged to have occurred on or about October 16, 2006, November 1, 2006, and November 27, 2006, the four-way, respectively. That indictment also contains two counts, Counts X and XIV, alleging that Appellant caused K.L.P.'s sexual organ to contact K.M.P.'s mouth and one count, Count XV,

---

[15] *See* Tex. Penal Code Ann. § 22.011(a)(2)(C), (f) (Vernon Supp. 2009).

alleging that he caused K.L.P.'s sexual organ to contact K.O.P.'s mouth. For these counts, the prosecutor elected to rely on conduct alleged to have occurred on or about September 25, 2006, November 27, 2006, the four-way, and November 1, 2006, respectively.

K.L.P. testified that in mid-October 2006, Appellant told her that he wanted to do something different, "69." He put his mouth on her genitals, and she likewise performed oral sex on him. K.L.P. testified that she and Appellant performed oral sex on each other (with no one else around) a couple more times in 2006, approximately once in November and once in December.

Additionally, K.O.P. testified that during the second four-way she remembered, which she believed happened around the second week in November 2006, Appellant performed oral sex on each daughter. Neither K.L.P. nor K.M.P. testified that Appellant performed oral sex on K.L.P. during the four-way.

K.L.P. testified that in late September or early October 2006, she, Appellant, and K.M.P. had a "three-way." K.L.P. and K.M.P. both testified that during the event, K.M.P. performed oral sex on K.L.P.

K.L.P. and K.M.P. also both testified that K.M.P. performed oral sex on K.L.P. during the four-way.

K.L.P. testified that in early November 2006, Appellant, K.L.P., and

21

K.O.P. had a "three-way." K.L.P. testified that both girls performed oral sex on each other during the event. K.O.P. denied ever performing oral sex on or receiving oral sex from her sisters. Again, the jury may choose to believe all, part, or none of a witness's testimony.[16] The 2006 calendar and K.L.P.'s overlay support the State's elections.

Applying the appropriate standard of review, we hold that the evidence is factually sufficient to support Appellant's convictions for these six counts.

### b. K.M.P.

The indictment alleging conduct perpetrated against K.M.P. contains three counts, Counts V, IX, and XIII, alleging that Appellant caused her sexual organ to contact his mouth. For these counts, the prosecutor elected to rely on conduct alleged to have occurred on or about December 4, 2006, the three-way, December 1, 2006, and November 27, 2006, the four-way, respectively. That indictment also contains two counts, Counts VI and XIV, alleging that Appellant caused K.M.P.'s sexual organ to contact K.L.P.'s mouth and one count, Count XV, alleging that he caused K.M.P.'s sexual organ to contact K.O.P.'s mouth. For these counts, the prosecutor elected to rely on conduct alleged to have occurred on or about December 4, 2006, November 27, 2006,

---

[16] *Losada*, 721 S.W.2d at 309.

and November 27, 2006, respectively, that is, the three-way and four-way.

K.M.P. remembered that the first occasion in which she and Appellant performed oral sex on each other at the same time happened before the three-ways and four-ways and before Christmas 2006. The event was recorded on K.M.P.'s overlay to the 2006 calendar at trial.

The 2006 calendar and K.M.P.'s overlay provide that the first three-way she remembered happened on or about December 4, 2006. K.M.P. remembered two "three-ways," one after school started but before Christmas and one after the twins' seventeenth birthday (and therefore not part of the indicted conduct). K.M.P. testified that during that first episode with K.L.P. and Appellant, Appellant performed oral sex on K.M.P. K.M.P. and K.L.P. also testified that K.L.P. performed oral sex on K.M.P. during that event.

K.L.P., K.M.P., and K.O.P. testified that during the four-way, Appellant performed oral sex on K.M.P. K.M.P. also testified that K.L.P. and K.O.P. both performed oral sex on her during the four-way, although K.O.P. denied ever performing oral sex on her sisters. Again, the jury could choose to believe all, part, or none of a witness's testimony and was responsible for resolving all conflicts in the evidence.[17]

---

[17] *Id.*

23

Based on the applicable standard of review, we hold that the evidence is factually sufficient to support Appellant's convictions on these six counts.

### c. K.O.P.

The indictment alleging conduct perpetrated against K.O.P. contains three counts, Counts V, IX, and XI, alleging that Appellant caused her sexual organ to contact his mouth. For these counts, the prosecutor elected to rely on conduct alleged to have occurred on or about November 20, 2006, September 3, 2007, and November 19, 2007, respectively. That indictment also contains one count, Count VI, alleging that Appellant caused K.O.P.'s sexual organ to contact K.M.P.'s mouth and one count, Count VII, alleging that he caused K.O.P.'s sexual organ to contact K.L.P.'s mouth. For these counts, the prosecutor elected to rely on conduct alleged to have occurred on or about November 27, 2006, the four-way.

K.L.P. and K.M.P. both testified that they performed oral sex on K.O.P. during the four-way, which K.L.P. placed near the end of November 2006. K.O.P. denied ever receiving oral sex from either sister.

K.O.P. testified that after the four-way, which she placed in early to mid-November 2006, until her Mother came home in June 2007, she and Appellant performed simultaneous oral sex on each other once or twice each week. By August 2007, K.O.P. testified, she and Appellant were again performing oral

24

sex on each other once or twice a week, and this behavior continued through the end of November 2007.

The 2006 and 2007 calendars, along with K.O.P.'s and K.L.P.'s overlays, support the dates elected by the State.

Based on the applicable standard of review, we hold that the evidence is factually sufficient to support Appellant's convictions on these five counts.

### 4. Count Alleging Penetration of K.L.P.'s Sexual Organ by Appellant's Sexual Organ[18]

Appellant was charged in one count with penetrating K.L.P.'s sexual organ with his sexual organ. For this count, the prosecutor elected to rely on conduct alleged to have occurred on or about November 27, 2006, during the four-way. K.L.P. testified that during the late November 2006 four-way, Appellant penetrated her sexual organ with his penis. She also testified that her sisters were aware during the four-way that she had already had vaginal intercourse with Appellant in a previous encounter, and she also testified that the first time she and Appellant had had vaginal intercourse was after the three-way with K.O.P., which happened at the end of October or beginning of November 2006. (The third time that K.L.P. had vaginal intercourse with

---

[18] *See* Tex. Penal Code Ann. § 22.011(a)(2)(A), (f) (Vernon Supp. 2009).

25

Appellant, according to the girls' testimony, was the night of Christmas 2006 in Amarillo, for which Appellant was not indicted in Parker County.)

K.O.P. also testified that Appellant and K.L.P. had penile-vaginal intercourse during the four-way, which she placed in mid-November 2006. The 2006 calendar and K.L.P.'s overlay support the State's election.

Based on the applicable standard of review, we hold that the evidence is factually sufficient to support Appellant's conviction for penetrating K.L.P.'s sexual organ with his sexual organ.

### D. Factually Sufficient Evidence on All Live Counts

Having held the evidence factually sufficient to support Appellant's forty-three convictions, we overrule his third, fourth, fifth, sixth, seventh, and eighth points.

## II. The State's Election

The State elected which acts to rely on after the close of all the evidence. The jury charge did not contain an instruction regarding the elections. The jury charge did include the following,

> The defendant is on trial solely on the charges contained in the indictment. In reference to evidence, if any, that the defendant has engaged in transactions or acts other than that which is charged by the indictment in this case, you are instructed that you cannot consider such other transactions or acts, if any, for any purpose, unless you find and believe beyond a reasonable doubt that the defendant engaged in said transactions or acts, and, even then, you

26

may only consider said evidence for the purposes of determining the state of mind of the defendant and the child, or the previous and subsequent relationship between the defendant and the child, if any, and only for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, or absence of mistake or accident.

The prosecutors, using "cheat sheets" and the calendars and overlays in State's Exhibits 8, 8A, 8B, 8C, 9, 9A, 9B, and 9C, discussed every election in their closing argument. The prosecutor also explained to the jury,

> Robert and I have to make cheat sheets for everything. And what we've done and what we're going to go through in just a minute here is we made cheat sheets with respect to each and every one of the allegations that's alleged in the indictment. And I'm going to walk you through . . . my part of the closing as to how we get a conviction on each and every one of those.
>
> The first thing I want to talk about, though, is you'll remember back from voir dire conversation about on or about. Mr. DuBoise told you that the [S]tate has to put a date in the indictment. You'll see off to the side of my little cheat sheet here 5/1/06, 7/1/06, 8/1/06. We have to pull a date on or about the time that we believe, based upon the time of the indictment, that an act may have occurred.
>
> What the law says and what the charges told you is that if the [S]tate proves that these acts happened at any time prior to the indictment, for all intents and purposes, that that's going to be sufficient for you if we've proven each and every element. And we don't necessarily have to prove the specific date in the indictment.
>
> The other thing that I want to talk about real quick is that the law says that in a case of this nature, we can bring to you every act, every sexual act that occurred between a defendant and a victim, okay? We have to point you to specific acts for you to convict in the indictment.

27

So while you may have heard of 75 cases where the defendant had oral sex performed on him by a particular daughter, we as the [S]tate have to point you to a specific act, and we're going to do that as we go through the cheat sheets. With respect to the other 49 of the 50, for example, that you've heard, you're allowed to consider that, if you think it's relevant, and if it's proven to you beyond a reasonable doubt with respect to things like state of mind of the victim, state of mind of the defendant, absence of mistake, intent, motive, things of that nature. And all that stuff, again, is in the charge.

In his first point, Appellant contends that the trial court reversibly erred by denying his motion to require the State to make an election and by not thereafter restricting the jury's deliberations at guilt according to the election. In his second point, Appellant contends that the trial court abused its discretion by denying his request for a jury charge limiting "the jury's consideration of offenses to those acts on specific dates relating to a specific count in the indictments for purposes of determining whether the allegations in said count were proven beyond a reasonable doubt to support a conviction thereunder as opposed to permitting the jury to convict on an extraneous matter."

## A. Appellant's Motion to Have the State Elect

The trial court denied the first part of Appellant's motion, which requested the State to make an election of which of multiple acts arising out of the same criminal transaction and continuing criminal episode that it desired

28

to prosecute and waive the others so as to avoid a "stop action" prosecution.[19] Appellant mentions this ruling but does not otherwise address it in his brief. To the extent that he complains of the ruling, we overrule such complaint as inadequately briefed.[20]

The second part of Appellant's motion to elect asked that the trial court force the State to be specific as to which date related to which count of the various acts alleged so that he could understand what evidence he was defending against as to each count. While the trial court initially denied this motion, the trial court later granted it, and, for each live count, the prosecutor read a date into the record. We therefore overrule Appellant's first point to the extent that it complains about the denial of his motion.

## B. Omitted Jury Instruction is Error, But Harmless

Regarding Appellant's complaints about the jury charge, found in both his first and second points, when the State elects an act on which it will rely for conviction of an offense, a defendant is entitled to a jury instruction providing that the jury should consider only the elected act in determining whether a

---

[19] *See Patterson v. State,* 152 S.W.3d 88 (Tex. Crim. App. 2004).

[20] *See* Tex. R. App. P. 38.1(i); *Tong v. State,* 25 S.W.3d 707, 710 (Tex. Crim. App. 2000), *cert. denied,* 532 U.S. 1053 (2001); *Mosley v. State*, 983 S.W.2d 249, 256 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999).

defendant is guilty of that offense and limiting the jury's consideration of other, unelected acts to the purposes for which they were admitted.[21] The State concedes that the trial court erred by not so instructing the jury.

Error in the charge, if timely objected to in the trial court, requires reversal if the error was "calculated to injure the rights of [the] defendant," which means no more than that there must be *some* harm to the accused from the error.[22] In other words, a properly preserved error will require reversal as long as the error is not harmless.[23] In making this determination, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole."[24]

---

[21] *Isenhower v. State*, 261 S.W.3d 168, 174 (Tex. App.—Houston [14th Dist.] 2008, no pet.); *Rivera v. State*, 233 S.W.3d 403, 406 (Tex. App.—Waco 2007, pet. ref'd).

[22] Tex. Code Crim. Proc. Ann. art. 36.19 (Vernon 2007); *Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see also Minor v. State*, 91 S.W.3d 824, 827–29 (Tex. App.—Fort Worth 2002, pet. ref'd) (applying analysis).

[23] *Almanza*, 686 S.W.2d at 171.

[24] *Id.*; *see also Ovalle v. State*, 13 S.W.3d 774, 786 (Tex. Crim. App. 2000).

Given the extensive evidence, especially the testimony of the complainants, the 2006 and 2007 calendars with overlays, to which the jury had access, and the State's count-by-count recitation in its closing argument of which date and act it was relying on for every live count and why, we conclude that the trial court's error in omitting an instruction concerning election in the charge was harmless. Accordingly, we overrule Appellant's first two points.

### III. Conclusion

Having overruled all of Appellant's points, we affirm the trial court's judgments.

PER CURIAM

PANEL: DAUPHINOT, LIVINGSTON, and GARDNER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: October 22, 2009